IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
June 14, 2005 Session

## IN THE MATTER OF: C.M.C., C.L.C., and D.A.M.

**Direct Appeal from the Juvenile Court for Greene County**
**No. 16386      Thomas J. Wright, Judge**

_____

### No. E2005-00328-COA-R3-PT - FILED AUGUST 3, 2005

_____

The trial court terminated Mother's parental rights based on abandonment, substantial noncompliance with a permanency plan, persistence of conditions, and a finding that termination was in the best interests of the children. Mother appeals. We reverse.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Reversed; and Remanded**

DAVID R. FARMER, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and ALAN E. HIGHERS, J., joined.

M. Brent Hensley, Greeneville, Tennessee, for the appellant, SAF.

Paul G. Summers, Attorney General and Reporter, and Sharon G. Hutchins, Assistant Attorney General, for the Petitioner/Appellee, State of Tennessee, Department of Children's Services.

### OPINION

On December 31, 2002, the trial court removed C.M.C. (born 5/4/1992), C.L.C. (born 7/11/1995), and D.A.M. (born 7/1/1999) (collectively, "the children") from Mother's custody upon a petition for temporary custody filed by the Department of Children's Services ("DCS"). In its petition, DCS alleged that Mother had been evicted from her home, had a history of substance abuse, and was living with a man, Billy McClain (Mr. McClain), who was known by DCS to have been abusive to Mother. DCS further alleged the children were dependent and suffering from neglect. The children were returned to Mother's custody in May 2003 for a 90-day trial period. In its order granting the trial period, the trial court ordered Mother to have no contact with Mr. McClain. In July 2003, the children were returned to DCS custody after DCS alleged that Mother had left them in Mr. McClain's company. Following an August hearing, in October 2003 the trial court entered an order finding Mother to be in contempt for violating the no contact order and ordering Mother to pay child support of $75.00 per month to the Child Support Receiving Unit.

On August 24, 2004, DCS petitioned to terminate the rights of Mother and the fathers of the children. The trial court heard the matter in December 2004 and terminated Mother's rights based on the statutory grounds of abandonment, substantial noncompliance with a permanency plan, and persistence of conditions and upon finding that termination was in the best interests of the children. Mother filed a timely notice of appeal to this Court. We reverse.[1]

### *Standard of Review*

Our standard of review of a trial court sitting without a jury is *de novo* upon the record. *Wright v. City of Knoxville*, 898 S.W.2d 177, 181 (Tenn.1995). There is a presumption of correctness as to the trial court's findings of fact, unless the preponderance of evidence is otherwise. Tenn. R. App. P. 13(d). However, no presumption of correctness attaches to a trial court's conclusions on issues of law. *Bowden v. Ward*, 275 S.W.3d 913, 916 (Tenn.2000); Tenn. R. App. P. 13(d).

Tennessee Code Annotated § 36-1-113 governs the termination of parental rights. The code provides, in pertinent part:

> (c) Termination of parental or guardianship rights must be based upon:
> (1) A finding by the court by clear and convincing evidence that the grounds for termination or parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

Tenn. Code Ann. § 36-1-113(c)(2001). This section also provides the grounds on which parental rights may be terminated. The existence of any statutory ground for termination of parental rights will support the trial court's decision to terminate those rights. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

A court's determination to terminate parental rights must be supported by clear and convincing evidence. *Id.* Clear and convincing evidence is "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Id.* (quoting *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n. 3 (Tenn.1992)). In describing what constitutes clear and convincing evidence, this Court has stated:

> [a]lthough it does not require as much certainty as the "beyond a reasonable doubt" standard, the "clear and convincing evidence" standard is more exacting than the "preponderance of the evidence" standard. *O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn. App. 1995); *Brandon v. Wright*, 838 S.W.2d 532, 536 (Tenn. App. 1992). In order to be clear and convincing, the evidence must eliminate any serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence. *Hodges v. S.C. Toof & Co.*,

---

[1] The fathers of the children have not appealed termination of their parental rights.

833 S.W.2d 896, 901 n.3 (Tenn. 1992); *O'Daniel v. Messier*, 905 S.W.2d at 188. Such evidence should produce in the fact-finder's mind a firm belief or conviction as to the truth of the allegations sought to be established. *O'Daniel v. Messier*, 905 S.W.2d at 188; *Wiltcher v. Bradley*, 708 S.W.2d 407, 411 (Tenn. App. 1985). In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is "highly probable" as opposed to merely "more probable" than not. *Lettner v. Plummer*, 559 S.W.2d 785, 787 (Tenn. 1977); *Goldsmith v. Roberts*, 622 S.W.2d 438, 441 (Tenn. App. 1981); *Brandon v. Wright*, 838 S.W.2d at 536.

*In re C.W.W., N.W.W., Z.W.W., & A.L.W.*, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000).

### *Analysis*

We begin our analysis by reiterating that "a parent has a fundamental right to the care, custody and control of his or her child." *Stanley v. Illinois*, 405 U.S. 645, 651 (1972). Further, "[f]ew consequences of judicial action are so grave as the severance of natural family ties." *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)(Rehnquist, J., dissenting). In light of the fundamental nature of parental rights and the gravity of the termination of those rights, "[t]he federal and state constitutions require the opportunity for an individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999). A parent's right to the care, custody, and control of his or her child may be terminated only if clear and convincing evidence justifies termination under the applicable statutes. *Santosky v. Kramer*, 455 U.S. at 769.

The Tennessee Code provides the following grounds on which parental rights may be terminated:

> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;
> (2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care pursuant to the provisions of title 37, chapter 2, part 4;
> (3)(A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
> (i) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

-3-

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

(4) The parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such child, or any other child residing temporarily or permanently in the home of such parent or guardian;

(5) The parent or guardian has been sentenced to more than two (2) years' imprisonment for conduct against the child who is the subject of the petition, or for conduct against any sibling or half-sibling of the child or any other child residing temporarily or permanently in the home of such parent or guardian, which has been found under any prior order of a court or which is found by the court hearing the petition to be severe child abuse, as defined in § 37-1-102(b)(21). Unless otherwise stated, for purposes of this subdivision, "sentenced" shall not be construed to mean that the parent or guardian must have actually served more than two (2) years in confinement, but shall only be construed to mean that the court had imposed a sentence of two (2) or more years upon the parent or guardian;

(6) The parent has been confined in a correctional or detention facility of any type, by order of the court as a result of a criminal act, under a sentence of ten (10) or more years, and the child is under eight (8) years of age at the time the sentence is entered by the court.

(7) The parent has been convicted of or found civilly liable for the intentional and wrongful death of the child's other parent or legal guardian.

Tenn. Code Ann. § 36-1-113(g)(1)-(7)(Supp. 2004). In this case, the trial court terminated Mother's parental rights pursuant to sections 36-1-113(g)(1), (2) and (3)(A).

### *Abandonment*

We first turn to whether clear and convincing evidence supports termination of Mother's parental rights based on abandonment under section 36-1-113(g)(1). The Tennessee Code provides, in pertinent part:

(1)(A) "Abandonment" means, for purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, that:
(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit

or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;

(ii) The child has been removed from the home of the parent(s) or guardian(s) as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date;

(iii) A biological or legal father has either willfully failed to visit or willfully failed to make reasonable payments toward the support of the child's mother during the four (4) months immediately preceding the birth of the child; provided, that in no instance shall a final order terminating the parental rights of a parent as determined pursuant to this subdivision (iii) be entered until at least thirty (30) days have elapsed since the date of the child's birth;

(iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration which exhibits a wanton disregard for the welfare of the child; or

(v) The child, as a newborn infant aged seventy-two (72) hours or less, was voluntarily left at a facility by such infant's mother pursuant to § 68-11- 255; and, for a period of thirty (30) days after the date of voluntary delivery, the mother failed to visit or seek contact with the infant; and, for a period of thirty (30) days after notice was given under § 36-1-142(e), and no less than ninety (90) days cumulatively, the mother failed to seek contact with the infant through the department or to revoke her voluntary delivery of the infant.

(B) For purposes of this subdivision (1), "token support" means that the support, under the circumstances of the individual case, is insignificant given the parent's means;

(C) For purposes of this subdivision (1), "token visitation" means that the visitation, under the circumstances of the individual case, constitutes nothing more

than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child;

(D) For purposes of this subdivision (1), "willfully failed to support" or "willfully failed to make reasonable payments toward such child's support" means the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child;

(E) For purposes of this subdivision (1), "willfully failed to visit" means the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation;

(F) Abandonment may not be repented of by resuming visitation or support subsequent to the filing of any petition seeking to terminate parental or guardianship rights or seeking the adoption of a child; and

(G) "Abandonment" and "abandonment of an infant" do not have any other definition except that which is set forth in this section, it being the intent of the general assembly to establish the only grounds for abandonment by statutory definition. Specifically, it shall not be required that a parent be shown to have evinced a settled purpose to forego all parental rights and responsibilities in order for a determination of abandonment to be made. Decisions of any court to the contrary are hereby legislatively overruled;

Tenn. Code Ann. § 36-1-102(1)(Supp. 2004).

The trial court in this case found abandonment based on willful failure to visit and willful failure to support. The trial court found that Mother had failed "without good cause or excuse, to make reasonable and consistent payments for the support of the children in accordance with the child support guidelines promulgated by the Tennessee Department of Human Services pursuant to T.C.A. 36-5-101" and "to seek reasonable visitation with the children, and if visitation has been granted, has failed to visit altogether or has engaged in only token visitation as defined in T.C.A. 36-1-102(1)(D)."

The element of willfulness is essential to the court's determination of abandonment. *See In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999). Although willfulness in the context of the statutes governing the termination of parental rights does not require a finding of malice or ill will, it does require clear and convincing evidence of choice of action, free from coercion, made by a free agent. *In re Adoption of Kleshinski*, No. M2004-00986-COA-R3-CV, 2005 WL 1046796, at \*18 (Tenn. Ct. App. May 4, 2005)(*no perm. app. filed*)(citations omitted). A custodial parent's or third party's conduct excuses a parent's willful failure to visit only where that conduct actually prevents or significantly hinders the parent from doing so. *In re DMD*, No. W2003-00987-COA-R3-PT, 2004 WL 1359046, at \*3 (Tenn. Ct. App. June 17, 2004).

In this case, the revised permanency plan dated December 11, 2003, states that Mother "ha[d] made several request[s] to visit with her children" despite visitation being at the discretion of the

foster parents and despite requests from two of the children for no contact. Mr. M., DAM's paternal grandfather and foster care provider, testified that Mother visited with DAM in the spring of 2004 and that Mother had spoken to DAM when he answered the telephone three or four months prior to the December 2004 hearing. Mr. M. also testified that Mother had telephoned two or three times in the three months prior to the December hearing to inquire about DAM, but that she had not asked to see him. As Mr. M. further testified, however, Mother was under a court order to have no contact with her children from the date of the previous review hearing of April 20, 2004.

The technical record in this case reflects that the trial court held a hearing to "review the progress of the parties" on April 20, 2004, and that it ordered that "the children are to have no contact with the Mother." This order was entered by the trial court on June 2, 2004, but the no contact order apparently was understood by the parties to be effective from the date of the hearing. The petition to terminate Mother's parental rights was filed on August 24, 2004, four months subsequent to the trial court's no contact order.

"[T]he willful failure to visit, support, or make reasonable payments toward the support of the child must have occurred in the four months immediately preceding the filing of the petition currently before the court." *In re D.L.B.*, 118 S.W.3d 360, 366 (Tenn. 2003). In light of the trial court's no contact order of April 2004, we can hardly agree that Mother willfully failed to visit her children in the four months immediately preceding the filing of the August 2004 termination petition. Indeed, Mother would have been in contempt of court had she attempted to contact her children during this period. It is undisputed, however, that Mother contacted both Mr. M. and DCS to inquire about the welfare of her children. Mr. James Denney (Mr. Denney), the DCS county case manager who managed this case from its inception in December 2002, testified that Mother had telephoned his offices on a number of occasions requesting visitation prior to the no contact order and that she had continued to contact his office following entry of the April no contact order. Moreover, it is undisputed that prior to the no contact order, Mother's visitation with her children was at the discretion of DCS and the foster care providers. In light of the foregoing, we reverse the finding of abandonment based on the willful failure to visit.

We next turn to whether the record supports a finding of abandonment based on the willful failure to support. This Court recently has noted that,

> [t]erminating parental rights based on failure to support presupposes (1) that the parent is aware of his or her duty to support, (2) that the parent is able to provide financial support, either through income from private employment or qualification for government benefits, and (3) that the parent has voluntarily and intentionally chosen not to provide financial support without a justifiable excuse.

In re M.J.B., 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004).

Merely demonstrating that a parent failed to provide support is not sufficient to establish willful failure to support. *Id.* at 655. As this court repeatedly has held, a parent's failure to support

their child because he or she is financially unable to do so does not constitute a willful failure to support. *E.g., O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn. Ct. App.1995); *In re Adoption of Kleshinski*, No. M2004-00986-COA-R3CV, 2005 WL 1046796, at *18 (Tenn. Ct. App. May 04, 2005)(*no perm. app. filed*). Further, where a child has been placed in DCS custody pursuant to a dependent-neglect proceeding, the duty to support may be established by external factors, including the permanency plan for the child or by a court order defining the support obligation. *In re M.J.B.*, 140 S.W.3d at 655. However a third party's interference with a parent's attempts at visitation does not excuse the parent from his obligation to support the child financially. *In re DMD*, No. W2003-00987-COA-R3PT, 2004 WL 1359046, at *3 (Tenn. Ct. App. June 17, 2004).

In her brief to this Court, Mother's argument, as we perceive it, is that she was unsure of her child support obligation and that she was unable to pay child support because "among other reasons[,]" she had a history of seizures and was unable to work after a seizure in July 2004. However, following a hearing on August 26, 2003, in October 2003 the trial court ordered Mother to pay child support of $75 per month to the Child Support Receiving Unit. Mother testified to being aware of the court's order and to having failed to pay child support for the four months preceding the December hearing. Thus, any assertion by Mother that she was unsure of her obligation is without merit.

It is undisputed that Mother failed to pay the child support ordered by the court and specified on the revised permanency plan for DAM. We must determine, however, whether Mother's failure to pay child support for the four months preceding the filing of the petition to terminate her parental rights was willful. Whether a parent's failure to support was willful must be determined under the particular facts and circumstances of each case. *See In re Swanson*, 2 S.W.3d 180, 184-85 (Tenn.1999). Additionally, when determining whether a parent has willfully failed to support his child, we must consider the four months immediately preceding the filing of the petition currently before the court. *In re D.L.B.*, 118 S.W.3d 360, 366 (Tenn. 2003).

Mother asserts that she was unable to work following the onset of seizures on July 28, 2004. Mother testified that, prior to experiencing seizures, she had been doing "tree work" and "pulling brush" and that she had her first seizure on the job on July 28. She further testified that she had worked in "probably March maybe" of 2004 and had applied for social security disability benefits following her July seizure. The Social Security Administration approved Mother's application for disability benefits on October 25, 2004.

The burden is on DCS to prove by clear and convincing evidence that Mother had the means but willfully failed to support her children in the four months immediately preceding the termination petition currently before the court. Although Mother testified that, prior to her first seizure on July 28, 2004, she worked intermittently doing "tree work" in 2004, the record does not reflect how much Mother actually earned in the four months preceding the August 2004 petition to terminate her parental rights. As DCS observes, Mother also testified that she earned $125 per week over a three or four-month period in the later part of 2003 or early 2004 and that, for the two-year period preceding the termination hearing, she had lived in her sister's home contributing only food stamps,

some food, and household chores to the household. Further, as DCS also asserts in its brief to this Court, it is undisputed that, despite intermittent employment and virtually no household expenses, Mother made little or no effort to fulfill any of her child support obligation as ordered by the court in October 2003. However, it is the four month period of April 24 to August 24, 2004, that is relevant to our inquiry here.

The trial court found that Mother made no child support payments during this period. Mr. Denney, however, testified that, although he had a "hard time" reading the computer print out report in the record, it appeared that Mother made two support payments totaling $85 in June 2004. Mother testified that she made at least one payment during this period. Additionally, in the absence of any evidence regarding what Mother actually earned in this period, we cannot determine that a payment of $85 was not reasonable considering Mother's income during the four months preceding the termination petition. Moreover, it is undisputed that the Social Security Administration determined that Mother was unable to work and became eligible for, but had not yet received, disability benefits following the on-set of seizures in July 2004. Thus, Mother's failure to support clearly was not willful after July 28, 2004.

In light of the foregoing, we cannot say that clear and convincing evidence establishes that Mother had the ability to fulfill her child support obligation but willfully failed to do so during the four months immediately preceding the August 24, 2004, petition to terminate her parental rights. DCS simply has failed to carry its burden of proof on this issue. Accordingly, we reverse the trial court's finding of grounds based on willful abandonment.

### Substantial Noncompliance with the Permanency Plan

The trial court found that grounds existed for termination of Mother's parental rights based on substantial noncompliance with the requirements of the permanency plan. In order to determine that a parent has not substantially complied with the requirements of a permanency plan, the trial court must find that the requirements are "reasonable and related to remedying the conditions which necessitate foster care placement" as required by Tenn. Code Ann. § 37-2-403(a)(2)(C). *In re Valentine*, 79 S.W.3d 539, 547 (Tenn. 2002). These conditions include conditions "related both to the child's removal and to family reunification." *Id.* Further, a parent's noncompliance must be "substantial." *Id.* at 548. "In the context of the requirements of a permanency plan, the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement." *Id.* Substantial noncompliance is a question of law which we review *de novo* with no presumption of correctness. *Id.*

In the absence of limited circumstances not present in this case, DCS must make "reasonable efforts" to make it "possible for the child to return" safely to the child's home. Tenn. Code Ann. §§ 37-1-166(a)(2),-166(g)(2). Additionally, DCS may delay termination proceedings if it has not had sufficient opportunity to make reasonable efforts to provide services which would enable the child to return home safely. Tenn. Code Ann. § 36-1-113(h)(2)(C). DCS has made "reasonable efforts"

where, "in the exercise of reasonable care and diligence" it has "provide[d] services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1).

Whether DCS has made reasonable efforts to provide services to enable a child to return safely to the home must be decided on a case-by-case basis in light of the circumstances of the case. When determining whether DCS has made reasonable efforts, the court may consider factors such as:

> (1) the reasons for separating the parent from his or her child or children, (2) the parent's physical and mental abilities, (3) the resources available to the parent, (4) the parent's efforts to remedy the conditions that required the separation, (5) the resources available to the Department, (6) the duration of the parent's remedial efforts, and (7) the closeness of the fit between the conditions that led to the initial separation, the requirements in the permanency plan, and the Department's efforts.

*In re C.M.M. & S.D.M.,* No. M2003-01122-COA-R3-PT, 2004 WL 438326, at * 7 (Tenn. Ct. App. Mar. 9, 2004)(*no perm. app. filed*). Certainly, parents must also make reasonable efforts to substantially comply with the requirements of the permanency plan. DCS, however, bears the burden of proving, by clear and convincing evidence, substantial noncompliance despite DCS's reasonable efforts to provide appropriate services. Tenn. Code Ann. § 36-1-113(C); *e.g. In re C.M.M. & S.D.M.,* No. M2003-01122-COA-R3-PT, 2004 WL 438326, at * 7.

As noted above, DCS stated in its December 2002 petition for temporary custody that it was seeking removal of the children from Mother because Mother had a history of alcohol abuse and because the family had been evicted from its home and was living in an unsafe environment with Mr. McClain, who was known by DCS to be abusive to Mother. The goal of the initial permanency plan of January 2003 was the return of the children to Mother. The plan required Mother to: continue counseling to help her address her issues and for coping; obtain and maintain employment for at least four months; obtain clean, safe, adequate housing; attend and participate in parenting classes at one of the local agencies that offers classes; submit to alcohol and drug assessment and comply with the results of the assessment and submit to random drug screens; obtain reliable transportation which would permit her to meet her obligations and maintain employment. Mother was not present when the permanency plan was developed, but signed it at a permanency hearing held on February 18, 2003. Additionally, in August 2003 Mother was ordered to have no contact with Mr. McClain as a condition of a 90-day trial home placement.

Mr. Denney testified that Mother had obtained housing by Spring 2003 and that during the period of February to May, 2003, she was in compliance with the permanency plan, was "doing a real good job," and "making some strides." He testified that "she showed a genuine care and concern for her children" at this time. The children were returned to Mother for a 90-day trial period in May 2003, but were returned to DCS custody on July 28 because, according to Mr. Denney, Mother "was maintaining a relationship with a gentleman whom she was court ordered to stay away from, and through verification with the Sheriff's Department and through a co-worker who was on call that

night, they picked the children up at the Sheriff's Department, and the Sheriff's Department indicated that they had been left alone at the boyfriend's home."

A revised permanency plan was developed in December 2003. This plan revised the permanency goal to "exit custody to live with relative." In April 2004, the goal was again revised to "adoption." The goal of adoption was handwritten on the December plan. The revised permanency plan included no requirements for Mother and was not signed by her.

At the December 2004 hearing, Mother testified that she was living in a three bedroom home with her sister and her sister's family. She testified that she planned to obtain independent housing for herself and her children once they were returned to her care. Although she had maintained only intermittent employment, Mother had successfully secured disability benefits from the Social Security Administration. The record does not reflect, however, the amount of these benefits or when they were to commence. Although Mother had been given a car by Mr. M., it had been severely damaged by friends in a brawl. However, the record reflects that Mother had completed an educational program in parenting skills taught by the University of Tennessee Agricultural Extension Service in June 2003; had sought and received treatment, including prescription medication for bi-polar disorder, from the Nolachuckey-Holston Area Mental Health Center; had received and continues to receive counseling and therapy at the Church Street Pavillion; and had received counseling from mental health-care professionals at the Nolachuckey-Holston Area Mental Health Center approximately ten times in 2004. Additionally, Mother testified that she had attended several AA meetings but that she could not "get anybody to sign [her] paper" and stopped going after five or six meetings.

Mr. Denney, on the other hand, testified that he had no knowledge of whether Mother had attended parenting classes, that he had never seen Mother intoxicated, and that he had not asked her to submit to drug screens. He further testified that he did not know anything about her housing conditions after July 2003, and that he had no knowledge of whether she was homeless at the time of the December 2004 hearing. He also testified that he did not recall whether Mother had told him she was living on Hemlock Drive with her sister, despite the fact that Mother previously had given the Hemlock Drive address in court. Mr. Denney testified that he was aware that Mother had been receiving counseling at Church Street Pavillion, although he did not recall exactly what the counseling entailed. He testified that he recalled discussing Mother's AA meetings with her and that he did not tell her that attending the meeting would not be sufficient for assessment. Additionally, Mr. Denney testified that he did not recall telling Mother about agencies and resources which might be available to her for counseling or drug and alcohol assessment. Mr. Denney testified that, although Mother had telephoned numerous times, he did not document all of her calls but would "sometimes" try to return her calls. He also testified that he had not seen Mother since August 26, 2003. Finally, Mr. Denney testified that, regarding Mother's relationship with Mr. McClain, he knew "only [knew] what [he] heard through rumors."

The trial court determined that Mother had chosen not to avail herself of social services which would have helped her to address her substance abuse programs. However, upon review of

the permanency plans and the testimony in the record, we agree with Mother that she was given little in the way of guidelines or advice on how or where to receive the required services, how often she was to receive them, or what was expected in the way of satisfactory completion. The record contains neither testimony nor documentary evidence of services or assistance provided by DCS.

It is clear to this Court that DCS made very little effort to assist Mother to avail herself of necessary services or to reunify this family. As we have noted, reasonable efforts on the part of DCS "entail more than simply providing parents with a list of service providers and sending them on their way." *In re C.M.M. & S.D.M.,* No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *7. In this case, DCS failed to even provide Mother with a list. Essentially, DCS told Mother to get a job, a home, and counseling but gave her no guidance or assistance on how to comply or what resources might be available to her. After July 2003, moreover, DCS made no attempt to assist Mother and virtually no attempt even to return her telephone calls. The evidence simply does not support a finding of substantial noncompliance with a permanency plan despite reasonable efforts. Certainly, it does not support such a finding by clear and convincing evidence. Accordingly, we reverse termination of Mother's parental rights based on substantial noncompliance with a permanency plan.

### Persistence of Conditions

As this Court previously has noted, the efforts of DCS to assist a parent to correct the conditions which led to the removal of his or her child is often intertwined with the likelihood of the parent's success. *In re C.M.M. & S.D.M.,* No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *9. As noted above, in this case, DCS apparently made very little effort to assist Mother. Notwithstanding DCS's lack of effort, the evidence supports a finding that Mother was not homeless at the time of the hearing of this matter, but had been living with her sister for nearly two years. Certainly, clear and convincing evidence does not support a finding that Mother was homeless in light of Mr. Denney's testimony that he had not spoken with Mother and did not know whether she was homeless. Additionally, it is undisputed that Mother will have at least some means to support her children financially through social security disability payments. Although a drug screen taken on the day of the termination hearing was positive for benzodiazepines and opiates, there was neither evidence nor suggestion that this result was not caused by Mother's prescription medication. On the contrary, Mr. Denney testified that Mother had difficulty with alcohol and not illegal drugs. The breathalyzer monitor for alcohol registered 0.0.

We finally turn to the presence of Mr. McClain in Mother's life. Mother's connection to Mr. McClain, and certainly any potential contact between Mr. McClain and the children, appears to have been of considerable concern to the trial court. Mother does not dispute that she violated the trial court's order by permitting contact between Mr. McClain and the children during the trial home placement in Spring 2003. However, it is undisputed that Mother secured an order of protection against Mr. McClain in April 2004, and she testified to no longer associating with him. Mother also testified that she agreed Mr. McClain was not an appropriate person to have in the children's company. Additionally, we note that there is nothing in the record to support a finding that Mr. McClain was abusive toward the children, and Mr. Denney testified that all he knew about Mother's

relationship with Mr. McClain was "through rumors." Speculation based on rumor clearly is not clear and convincing evidence. We reverse termination of Mother's parental rights based on persistence of conditions.

### *Holding*

In light of the foregoing, we reverse the judgment of the trial court terminating Mother's parental rights to C.M.C., C.L.C., and D.A.M. DCS has failed to prove by clear and convincing evidence the existence of any statutory grounds for termination. Because DCS has failed to carry its burden to prove grounds, we do not reach the question of whether termination of Mother's parental rights is in the best interests of the children. Costs of this appeal are taxed to the Appellee, the State of Tennessee, Department of Children's Services.

_____
DAVID R. FARMER, JUDGE